1

AMAMGBO & ASSOCIATES
DONALD AMAMGBO, ESQ.

2

7901 Oakport Street, Suite 4900

3

Oakland, California 94621
Telephone: (510) 615-6000

4

Facsimile: (510) 615-6025

5

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP

6

223 25th Street

7

Richmond, California 94804
Telephone: (510) 237-9700

8

Facsimile: (510) 237-4616

9

LAW OFFICES OF NWAJEI & COMPANY
Lawrence D. Nwajei

10

4221 Wilshire Blvd., Suite 392
Los Angeles, CA 90010

11

Telephone: 323-549-0201
Facsimile: 323-549-0211

12

13

14

15

Counsel for Plaintiff

16

17

18

19

20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

21

SAN JOSE DIVISION

22

23

MARILYN VARNADO, on behalf of herself
and all others similarly situated,

No.

CLASS ACTION

24

Plaintiff,

COMPLAINT

25

v.

JURY TRIAL DEMANDED

26

JUNIPER NETWORKS, INC., MARCEL

27

GANI, WILLIAM R. HEARST III, SCOTT
KRIENS, STRATTON SCLAVOS, PRADEEP

28

SINDHU and WILLIAM R. STENSRUD,

[CORRECTED] CLASS ACTION COMPLAINT

ORIGINAL
FILED

JUL 2 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

ADR

MJJ

Defendants.

MARILYN VARNADO ("Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Juniper Networks, Inc. ("Juniper" or the "Company") between September 1, 2003 and May 22, 2006, by her undersigned attorneys, for her Class Action Complaint ("Complaint"), alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on her investigation (made by and through her attorneys), which investigation included, among other things, a review and analysis of: (i) public documents pertaining to the defendants; (ii) Juniper's filings with the Securities and Exchange Commission ("SEC"); (iii) press releases published by Juniper; (iv) analyst reports concerning Juniper; and (v) newspaper and magazine articles (and other media coverage) regarding Juniper and its business. Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1.      This is securities class action brought on behalf of all purchasers of Juniper's publicly traded securities between September 1, 2003 and May 22, 2006, inclusive (the "Class Period"), which securities were artificially inflated because of violations of the federal securities laws arising out of defendants' (i) dissemination of false and misleading statements concerning Juniper's financial results; and (ii) intentional and/or reckless disregard of basic accounting principles.

2.      On May 22, 2006, Juniper announced it had received a request for information from the U.S. Attorney for the Eastern District of New York related to its stock option grant practices. At that time, Juniper stated it was working actively to respond to the request, and further noted that its own Audit Committee was reviewing Juniper's option grants, assisted by independent counsel and advisers. This announcement came on the heels of numerous press reports that had been published

[CORRECTED] CLASS ACTION COMPLAINT

1 since March 2006 to the effect that management at many companies likely had "backdated" the

2 grant date of stock options to senior management personnel in order to increase the potential value

3 of those options to the recipients (backdating refers to the practice by which firms choose an option

4 grant date in the past with a lower stock price). Indeed, two separate reports released in May 2006

5 identified Juniper as one company whose patter of stock option grants to senior executives was

6 suspicious.

7      3.    On the revelations of May 2006 regarding Juniper's stock option grant practices, the

8 price of Juniper stock plummeted – from $18.45 per share at the close of trading on April 28, 2006

9 to $14.62 per share during the morning hours of May 22, 2006. This represented a loss in market

10 capitalization of over $2.16 billion.

11      4.    Backdating stock options, in effect, provides extra compensation to the grant

12 recipients while concealing the transfer of wealth from the shareholders. Arthur Levitt, former

13 Chairman of the SEC, recently described backdating in the most blunt term: "Backdating

14 'represents the ultimate in greed,' . . . 'It is stealing, in effect. It is ripping off shareholders in an

15 unconscionable way.'" Charles Forelle and James Bandler, *Five More Companies Show*

16 *Questionable Options Pattern,* THE WALL STREET JOURNAL, MAY 22, 2006, at A1.

17      5.    The practice of option backdating also has important accounting ramifications.

18 Under accounting rules in effect through December 31, 2005 (APB No. 25, "Accounting for Stock

19 Issued to Employees" (APB No. 25")), companies were allowed to expense options according to the

20 intrinsic value method, whereby the expense equaled the difference between the fair value of the

21 underlying stock and the exercise price of the option. This expense is obviously zero for option

22 grants where the exercise price equals the prevailing market price.

23      6.    Such is not the case when an option grant is "in the money" (priced below a stock's

24 fair market value at the time of the award). Options priced at below a stock's fair market value

25 when they are awarded results in an executive receiving an instant paper gain. Under APB No. 25,

26 that "paper gain" is the equivalent of additional compensation to the executive that must be treated

27 as a cost to the corporation. Since it appears that Juniper did not treat as an expense the amount by

28

[CORRECTED] CLASS ACTION COMPLAINT

1 | which the market price of Juniper's stock on the actual date the options were issued exceeded the

2 | exercise price of the options, Juniper overstated its reported profits.

3 |     7.     Apart from the foregoing, it is readily apparent that the defendants deliberately

4 | concealed from the investing public that Juniper had manipulated stock option grant dates. While

5 | the defendants maintained publicly that stock options to Juniper employees always were issued at

6 | the fair market value of Juniper's stock on the date of the grant, in practice, the defendants

7 | repeatedly manipulated option grant dates to coincide with particularly low share prices (so as to

8 | benefit option recipients).

9 |

10 |     8.     Plaintiff has brought this class action on behalf of similarly situated Juniper

11 | shareholders to seek redress for the damages caused by the defendants' unscrupulous and

12 | manipulative conduct.

13 | **II.   JURISDICTION AND VENUE**

14 |     9.     This action arises under Sections 10(b), and 20(a) of the Exchange Act of 1934

15 | ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated there under, 17

16 | C.F.R. §240.10b-5.

17 |     10.     This court has subject-matter jurisdiction over this action pursuant to Section 27 of

18 | the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

19 |     11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

20 | U.S.C. §1391. Many of the acts and practices complained of herein occurred in substantial part in

21 | this District. Juniper maintains its headquarters in this District at 1194 North Matilda Avenue,

22 | Sunnyvale, California 94089.

23 |     12.     In connection with the acts, transactions and conduct alleged herein, defendants,

24 | directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

25 | not limited to, the United States mails, interstate telephone communications and the facilities of a

26 | national securities exchange and market.

27 | **III.   THE PARTIES**

28 |

[CORRECTED] CLASS ACTION COMPLAINT

13.    Plaintiff MARILYN VARNADO purchased the publicly traded securities of Juniper at artificially inflated prices during the Class Period as set forth in the accompanying certification (incorporated by reference herein).

14.    Defendant Juniper is a Delaware corporation with its principal executive offices located at 1194 North Matilda Avenue, Sunnyvale, California 94089.  According to its public filings, Juniper is a leading provider of purpose-built Internet infrastructure solutions that meet the scalability, performance, density and compatibility requirements of rapidly evolving, optically-enabled Internet Protocol (IP) networks.  Juniper's common stock trades on NASDAQ under the ticker symbol "JNPR."

15.    Defendant Scott Kriens ("Kriens") has served as Chief Executive Officer and Chairman of the Board of Directors of Juniper since October 1996.  Defendant Kriens participated in the issuance of, signed, and/or certified as accurate, Juniper's false and misleading SEC filings during the Class Period.  Because of Defendant Krien's position, he knew the adverse non-public information about the business of Juniper as well as its finances and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management (and/or Board of Directors') meeting and via reports and other information provided to him in connection therewith.

16.    Defendant Pradeep Sindhu ("Sindhu") co-founded Juniper in February 1996and served as Chief Executive Officer and Chairman of the Board of Directors until September 1996. Since that time, Dr. Sindhu has served as the Vice Chairman of the Board of Directors and Juniper's Chief Technical Officer.  Defendant Sindhu participated in the issuance of and/or signed Juniper's false and misleading SEC filings during the Class Period.  Because of Defendant Sindhu's position, he knew the adverse non-public information about the business of Juniper as well as its finances and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management (and/or Board of Directors') meetings and via reports and other information provided to him in connection therewith.

17.    Defendant Marcel Gani ("Gani") joined Juniper as Chief Financial Officer in February 1997 and became Executive Vice President and Chief Financial Officer of Juniper in July 2002. In late 2004, Juniper announced that Mr. Gani would assume the position of Chief of Staff. Defendant Gani still holds that position at the present time.   Defendant Gani participated in the issuance of, signed, and/or certified as accurate, certain of Juniper's false and misleading SEC filings during the Class Period.  Because of Defendant Gani's position, he knew the adverse non-public information about the business of Juniper as well as its finances and present and future business prospects, via access to internal corporate documents, conversations and corrections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him connection therewith.

18.    By certifying (where required by the Sarbanes-Oxley Act of 2002) various of Juniper's SEC filings, Defendants Kriens, and Gani, represented that (i) those filings accurately portrayed Juniper's financial condition; and (ii) each had inspected Juniper's disclosure and internal financial reporting controls and found them to be effective.

19.    Defendant William R. Hearst III ("Hearst") has served as a director of Juniper since 1996 and was a member of Juniper's Audit Committee (the "Audit Committee") at all times during the Class Period. Defendant Hearst signed certain of Juniper's false and misleading SEC filings identified in this Complaint.

20.    Defendant Stratton Sclavos ("Sclavos") has served as a director of Juniper since 2000. He served as a member of Juniper's Audit Committee during at least a portion of 2003. Defendant Sclavos signed certain of Juniper's false and misleading SEC filings identified in this Complaint.

21.    As noted above, certain of the above-referenced defendants served as members of the Audit Committee of the Juniper Board between 2003 and 2006. Juniper's Audit Committee assists the Board in fulfilling its responsibilities for general oversight of the integrity of Juniper's financial statements; Juniper's compliance with legal and regulatory requirements; the qualifications and independence of the independent auditors retained by Juniper; the performance of Juniper's internal audit function and independent auditors; and risk assessment and risk management.  More

[CORRECTED] CLASS ACTION COMPLAINT

specifically, the Audit Committee's charter states that the responsibilities of the Audit Committee "shall include," *inter alia.*

a.    Overseeing the internal audit function and reviewing, on a continuing basis, the adequacy of Juniper's system of internal controls, including meeting periodically with Juniper's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in Juniper's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

b.    Reviewing and discussing with management and Juniper's independent auditors the annual audited financial statements and quarterly unaudited financial statements, including Juniper's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing Juniper's Annual Report on Form 10-K and Quarterly Reports on Form 10o-Q, respectively, with the SEC;

c.    Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors; and

d.    Reviewing, approving and monitoring Juniper's Worldwide Code of Business Conduct and Ethics.

22.    Accordingly, as members of the Audit Committee during all (or a portion) of the period between 2003 to 2006, Defendant Hearst and Defendant Sclavos both had the responsibility to, among other things, monitor Juniper's financial reporting processes and internal control systems and review Juniper's financial statements prior to their public dissemination. Defendant Hearst and Defendant Sclavos knew that Juniper's financial statements would be subsequently referred to and incorporated within Juniper's public filings. Consequently, these individuals had an obligation to ensure that those financial statements were not false and misleading. Nevertheless, as detailed herein, because of Defendants Hearst and Sclavos' intentional or reckless disregard of their duties, Juniper published financial statements that were materially false and misleading.

[CORRECTED] CLASS ACTION COMPLAINT

1    23.    Defendant William R. Stensrud has served as a director of Juniper since 1996. He

2    served on the Board's Compensation Committee throughout the Class Period. Defendant Stensrud

3    signed certain of Juniper's false and misleading SEC filings identified in this Complaint.

4    24.    Collectively, defendants Kriens, Sindhu, Gani, Hearst, Sclavos and Stensrud are

5    referred to herein as the "Individual Defendants." The Individual Defendants and Juniper are

6    collectively referred to herein as the "Defendants."

7    **IV.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING**

8    25.    By virtue of the Individual Defendants' positions within Juniper, they had access to

9    undisclosed adverse information about its business, operations, operational trends, finances, and

10    present and future business prospects. The Individual Defendants would ascertain such information

11    through Juniper's internal corporate documents (including Juniper's operating plans, budgets and

12    forecasts and reports of actual operations compared thereto), conversations and connections with

13    other corporate officers and employees, conversations and connections with vendors and customers,

14    attendance at sales, management, and Board of Director's meetings, including committees thereof,

15    and through reports and other information provided to them in connection with their roles and duties

16    as Juniper officers and directors.

17    26.    It is appropriate to treat the Individual Defendants collectively as a group for

18    pleading purposes and to presume that the materially false, misleading and incomplete information

19    conveyed in Juniper's public filings and press releases as alleged herein was the result of the

20    collective actions of the Individual Defendants identified above. The Individual Defendants, by

21    virtue of their high-level positions within Juniper, directly participated in the management of

22    Juniper, were directly involved in the day-to-day operations of Juniper at the highest levels and

23    were privy to confidential proprietary information concerning Juniper and its business, operations,

24    prospects, growth, finances, and financial condition, as alleged herein.

25    27.    The Individual Defendants were involved in drafting, producing, reviewing,

26    approving and/or disseminating the materially false and misleading statements and information

27    alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading

28

1  statements were being issued regarding Juniper, and approved or ratified these statements, in

2  violation of the federal securities law.

3       28.    As officers and controlling persons of a publicly-held company whose common

4  stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on

5  NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants

6  each had a duty to promptly disseminate accurate and truthful information with respect to Juniper's

7  financial condition and performance, growth, operations, financial statements, business, markets,

8  management, earnings and present and future business prospects, and to correct any previously

9  issued statements that had become materially misleading or untrue, so that the market price of

10 Juniper's publicly traded securities would be based upon truthful and accurate information. The

11 Individual Defendants' material misrepresentations and omissions during the Class Period violated

12 these specifics requirements and obligations.

13      29.    The Individual Defendants, by virtue of their positions of control and authority as

14 officers and/or directors of Juniper, were able to and did control the content of the various SEC

15 filings, press releases and other public statements pertaining to Juniper during the Class Period. The

16 Individual Defendants were provided with copies of the documents alleged herein to be misleading

17 prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their

18 issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the

19 public reports and releases detailed herein.

20 **V.    CLASS ACTION ALLEGATIONS**

21      30.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

22 Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or

23 otherwise acquired Juniper securities during the Class Period, and who were damaged thereby. The

24 Class Period is from September 1, 2003 through May 22, 2006.

25      31.    Excluded from the Class are the Defendants herein, members of the immediate

26 families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of

27 Defendant Juniper, any entity in which any excluded person has a controlling interest, and the legal

28 representatives, heirs, successors and assigns of any excluded person.

[CORRECTED] CLASS ACTION COMPLAINT

32.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at the present time and can only be ascertained from books and records maintained by Juniper and/or its agent(s), Plaintiffs believes that there are tens of thousands of members of the Class located throughout the United States.  As of May 22, 2006, Juniper had issued and outstanding over 565.75 million shares of common stock.  Throughout the Class Period, Juniper common stock was actively traded on NASDAQ, with more than 6.56 billion shares traded during the Class Period.

33.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained extremely competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members if the Class.

34.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class purchased Juniper securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the Defendants' acts and omissions and fraudulent scheme complained of herein;

b.    Whether the Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

c.    Whether the Defendants had knowledge of (or were reckless with respect to) the improper activities described herein;

d.    Whether the statements disseminated to the investing public, including investors in Juniper, during the Class Period omitted and/or misrepresented material facts about Juniper's true financial condition, business operations and future business prospects;

e.    Whether Defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

[CORRECTED] CLASS ACTION COMPLAINT

f.    Whether the market price of Juniper's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

g.    Whether Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

36.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged. Plaintiff does not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

37.    The names and addresses of the record owners of the shares of Juniper common stock and other securities purchased during the Class Period are available from Juniper and/or its transfer agent(s). Notice can be provided to persons who purchased or otherwise acquired Juniper common stock by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under the federal securities laws.

## VI.    OVERVIEW OF JUNIPER'S FRAUDULENT SCHEME

38.    Each of the Defendants is liable as a particular in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of Juniper's securities. Throughout the Class Period, Defendants disseminated materially false and misleading statements and concealed material adverse facts about Juniper's operations and financial condition. Among other fraudulent conduct, the Defendants reported inflated revenue figures for Juniper by failing to account properly for stock options made to Juniper employees (including senior management personnel).

39.    Juniper has publicly boasted of its adoption of (and adherence to) a strict ethical code. Indeed, in its Form 10-K dated March 7, 2006, Juniper noted it had "adopted a Worldwide Code of Business Conduct and Ethics that applies to our principal executive officer and all other

[CORRECTED] CLASS ACTION COMPLAINT

1  employees." That code apparently was designed to deter wrongdoing and to promote: (i) honest

2  and ethical conduct; (ii) full, fair, accurate, timely and understandable disclosure in reports and

3  documents that Juniper files with or submits to the SEC and in other public communications made

4  by Juniper; (iii) compliance with applicable governmental laws, rules and regulations. The code

5  specifically provide that:

> As a public company, Juniper, through its employees, directors, contractors and agents of Company entities worldwide, has a responsibility to provide full, fair, accurate, timely and understandable disclosure of its business and financial condition in the periodic reports we are required to file with the United States Securities and Exchange Commission. Because, the integrity of our financial information is paramount. Juniper's financial information guides the decisions of our Board of Directors and is relied upon by our stockholders and the financial markets.

10  However, notwithstanding its alleged adherence to strict ethical standards, throughout the Class

11  Period, the Defendants deceived the investing public by, among other things, issuing false and

12  misleading statements regarding Juniper's stock option programs and through the intentional and/or

13  reckless disregard of accounting principles applicable to stock option grants made to employees.

14      40.    By way of background, for at least past decade, stock options, which allow option

15  holders to acquire shares of a company's stock on a future date at a price determined by the plan

16  terms (the "exercise price") – most commonly the closing price for the stock on the day of or the

17  day before the grant – have been a popular form of executive compensation, supposedly because

18  they help align executive interests with those of the shareholders. As *The Wall Street Journal*

19  recently explained:

> Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price the day before. . .

>           * * *

> A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. No stock gain, no profit on the options.

25  Charles Forelle and James Bandler, *The Perfect Payday – Some CEOs Reap Millions By Landing*

26  *Stock Options When They Are Most Valuable; Luck – Or Something Else?* THE WALL STREET

27  JOURNAL, MARCH 18, 2006, at A1.

28

41.    Unfortunately, in practice, the granting of stock options to senior management frequently did not have the desired effect.  For example, options sometimes caused managers to look for ways to drive up stock prices in the short term through acquisitions, assist sales, or even fraud, rather than by effectively managing existing businesses for long terms success, as many shareholders would prefer.  Although compensation experts outline to debate whether or not these risks outweigh the incentives stock options are intended to provide, a second, potentially larger, problem is beginning to surface: stock option plans are becoming just another place to hide lavish and unprecedented executive compensation.

42.    More specifically, a series of recent reports in *The Wall Street Journal* (and in other publications) concluded that among several firms, a pattern of sharp stock appreciation after grant dates was indicative of backdating.  In the past several months, dozens of companies have been questioned by federal investigators (including the SEC and the U.S. Attorneys' Offices for the Southern and Eastern Districts of New York) about whether backdated option awards have (i) provided undisclosed benefits to senior executives and (ii) resulted in the filing of false financial statements.

43.    As noted above, backdating refers to the practice by which firms choose an option grant date in the past with a lower stock price.  The lower a stock option exercise price is, the more money the recipient can potentially make in the future by exercising the options.  Thus, which day's price the options carry can make a big difference.  By way of example, consider an executive who received 100,000 options on a day when a company's stock is at $30 per share.  Exercising them after the stock has reached $50 per share would bring a profit of $20 times 100,000, or $2 million.  However, if the grant date was a month earlier and the stock then was at $20 per share, the options would bring in an extra $1 million.

44.    As set forth above, a key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price.  Backdating the option grants so that they carry a lower price would run counter to this goal, by giving the recipient a paper gain right from the start.  Moreover, that instant paper gain is the equivalent of extra pay and, under Generally Accepted Accounting Principles ("GAAP") in effect until December 31, 2005 (APB Np.

[CORRECTED] CLASS ACTION COMPLAINT

25), constitutes a cost to Juniper. As such, a firm that failed to include such a cost in its books will have overstated its profits, and might need to restate past financial results.

45. The SEC requires that publicly traded companies present their financial statements in accordance with GAAP. *See* 17 C.F.R. §210.4-01(a)(1). GAAP consists of those principles recognized by the accounting profession as the conversations, rules, and procedures necessary to define accepted accounting practices at the particular time. Regulations S-X, to which Juniper is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

46. The SEC has adopted the view that backdating violates securities law and constitutes financial fraud when firms fail to record as compensation expense the amount by which the option grants were actually "in the money" at the time that the grant decision was made. For instance, in a complaint filed by the SEC against Peregrine Systems, Inc. in June of 2003, the SEC alleged that Peregine's option plan administrator used a "look back" process between quarterly Board meetings to identify the day with the lowest stock price over the interval and then declared this date to be the grant date. The SEC views this as a form of financial fraud because it resulted in the understatement of compensation expenses. Specifically, quoting from the SEC complaint. "[u]nder the applicable accounting rules, any positive difference in the stock price between the exercise price and that on the measurement date. . . had to be accounted for as compensation expense. By failing to record the compensation expense, Peregrine understated its expenses by approximately $90 million".

47. In addition, backdating stock option grant dates also has significant federal income tax implications. By way of background, favorable tax treatment was one reason that options gained popularity in the 1990s as a way to compensate employees, particularly executives. 28 U.S.C. §162(m), Section 162(m) of the Internal Revenue Code ("Section 162(m)"), provides that compensation in excess of $1 million per year (including gains on stock options) paid to a corporation's five most highly-compensated officers is tax deductible only if certain conditions are met. One of those conditions is that the compensation must be payable solely on account of the

1  attainment of one or more performance goals. Tax experts have opined that options backdated to a
2  day with a lower market price do not qualify for a Section 162(m) deduction (since such grants are
3  not deemed performance-based compensation). As such, companies with backdated options now
4  face the prospect of paying out significant sums to revise prior years' tax returns.

5        48.    A May 2006 study of 100 companies by the Rockville, Maryland-based Center for
6  Financial Research and Analysis ("CFRA") said that Juniper was among 17 companies in that
7  group which showed a "high-risk profile" for possible back-dating of options. Marc Siegel, director
8  of research at CFRA, said the firm's clients, which include investment managers, have been seeking
9  to identify companies with risky options patterns. CFRA looked at 100 companies that issued a
10  high proportion of options relative to their total executive compensation. It then identified those
11  that, on three or more occasions, granted options at exercise prices that matched, or were close to,
12  lows of Juniper stock price between 1997 and 2002, followed by a bounce of at least 10% in share
13  price.

14        49.    At or about that same time, J.P. Morgan analyst, Ehud Gelblum, issued a report
15  reviewing option grants to executives at seventeen companies (including Juniper) dating back to
16  1998. With respect to Juniper, Mr. Gelblum concluded that there existed a suspicious pattern of
17  grants at the stock's low price for a given month.

18        50.    On the heels of the CFRA report and the J.P. Morgan analysis, Juniper announced on
19  May 22, 2006 it had received a request for information from the U.S. Attorney for the Eastern
20  District of New York relating to its granting of stock options. At that same time, Juniper also
21  indicated that its Audit Committee was reviewing practices in the area. Federal investigators likely
22  are focusing on the stock option grants identified below which, when considered as a whole, reveal
23  a pattern consistent with backdating.

24        51.    Juniper's definitive proxy statement dated April 13, 2000 indicated that the
25  following stock options had been made to named executives during Juniper's fiscal year ended
26  December 31, 1999;

27        a.    Defendant Kriens received 900,000 options at an exercise price of $60.71 on
28  October 4, 1999;

[CORRECTED] CLASS ACTION COMPLAINT

1    b.    Defendant Sindhu received 540,000 options at an exercise price of $60.71 on

2    October 4, 1999;

3    c.    Defendant Gani received 240,000 options at an exercise price of $60.71 on

4    October 4, 1999;

5    d.    Steven Haley received 315,000 options at an exercise price of $60.71 on

6    October 4, 1999; and

7    e.    Peter Wexler received 240,000 options at an exercise price of $60.71 on

8    October 4, 1999;

9    52.    Remarkably, the lowest closing price of Juniper's stock during the calendar month of

10   October 1999 occurred on October 4, 1999 (the day of the grant in question).  Even more

11   remarkably, the value of Juniper's stock jumped considerably during the days following the stock

12   option grant of October 4, 1999.  By the close of trading on October 25, 1999 (three weeks after the

13   option grant in question), Juniper's stock stood at $81.33 (adjusted for a subsequent split), a 33.96%

14   jump in one week.  By the close of trading on October 25, 1999, Juniper's stock stood at $85.75

15   (adjusted for a subsequent split), a 41.24% increase over its October 4, 1999 close.  Juniper's stock

16   ended trading in October 1999 at $91.88 (again adjusted for a subsequent split).

17   53.    A similar pattern is seen with respect to options granted to senior management

18   personnel in late 2000, and again in early July 2002.  According to Juniper's definitive proxy

19   statement dated March 28, 2001, Juniper granted stock options to named executives as follows:

20   a.    Defendant Kriens received 400,000 options at an exercise price of $93.9375

21   on December 21, 2000;

22   b.    Defendant Sindhu received 540,000 options at an exercise price of $93.9375

23   on December 21, 2000;

24   c.    Defendant Gani received 100,000 options at an exercise price of $93.9375 on

25   December 21, 2000;

26   d.    Steven Haley received 100,000 options at an exercise price of $93.9375 on

27   October 4, 1999; and

28

[CORRECTED] CLASS ACTION COMPLAINT

1            e.     Peter Wexler received 100,000 options at an exercise price of $93.9375 on

2  October 4, 1999;

3      54.     The lowest closing price of Juniper's stock during the calendar month of December

4  2000 occurred on December 21, 2000 (the day of the grant in question).  Indeed, on December 1,

5  2000, Juniper's shares stood at $131.88.  By the close of trading on December 28, 2000 (one week

6  after the option grant in question), Juniper stock stood at $138.63, an increase of 40.39%).

7      55.     According to Juniper's definitive proxy statement dated March 28, 2003:

8            a.     Defendant Kriens received 550,000 options at an exercise price of $5.69 on

9  July 1, 2002;

10           b.     Defendant Sindhu received 300,000 options at an exercise price of $5.69 on

11  July 1, 2002;

12           c.     Defendant Gani received 500,000 options at an exercise price of $5.69 on

13  July 1, 2002;

14           d.     Lloyd Carney received 500,000 options at an exercise price of $5.69 on July

15  1, 2002;

16      56.     The lowest closing price of Juniper's stock during the calendar month of July 2002

17  occurred on July 1, 2002 (the day of the grant in question).  By the close of trading on July 8m 2002

18  (one week after the option grant in question), Juniper stock stood at $7.25, an increase of 27.4%.

19  Within two weeks of the date of the grant, Juniper's shares stood at $8.05 per share.  Indeed, by the

20  close of trading on July 31, 2002, Juniper's shares were trading at $8.00 per share, an increase of

21  40.59% over where they stood at the beginning of that calendar month.

22      57.     The reason for the foregoing pattern is clear – the Defendants engaged in the practice

23  of backdating options (they chose an option grant date in the past with a lower stock price in order

24  to inflate substantially the value of those options in the hands of the recipients).  The Defendants'

25  fraudulent conduct in this regard already has subjected Juniper to significant expense; and

26  potentially will subject Juniper to substantial regulatory fines, penalties and other damages and

27  costs, in that, among other things:

28

1       a.     Options priced at below a stock's fair market value when they are awarded

2 resulted in Juniper's executives receiving an instant paper gain. Under then applicable accounting

3 rules, that "paper gain" was the equivalent of additional compensation to the executive that had to

4 be treated as a cost to Juniper. Since it appears that Juniper did not treat as an expense the amount

5 by which the market price of Juniper's stock on the actual date the options were issued exceeded the

6 exercise price of the options, Juniper overstated its reported profits, and, as such, *might need to*

7 *restate past financial results.* Indeed, the U.S. Attorney's Office for the Eastern District of New

8 York already is investigating Juniper's stock option grant practices and no fewer than three (3)

9 derivative complaints are pending against Juniper's senior management team pertaining to this

10 issue. Moreover, at present, Juniper's Audit Committee also is investigating Juniper's historical

11 stock option grants;

12       b.     Section 162(m) provides that compensation in excess of $1 million per year

13 (including gains on stock options) paid to a corporation's five most highly-compensated officers is

14 tax deductible *only* if certain conditions are met. One of those conditions is that the compensation

15 must be payable solely on account of the attainment of one or more performance goals. Options

16 backdated to a day with a lower market price do not qualify for a Section 162(m) deduction (since

17 such grants are not deemed performance-base compensation). As such, companies like Juniper with

18 backdated options now face the prospect of paying out significant sums to revise prior years' tax

19 returns; and

20       c.     The backdating of stock options may negatively affect Juniper's credit rating on a

21 going-forward basis. A recent report issued by Moody's Investor Services ("Moody's") sets forth

22 several credit risks associated with backdating, including financial and reputation risk. According

23 to Jeffrey Benner, a Moody's analyst and one of the report's authors, backdating inquires could

24 raise ratings questions about a company's leadership, reputation, governance practices, and

25 financial performance. For instance, the report points out those investigations into backdating

26 already have led to leadership shakeups, as senior managers at several companies under

27 investigation departed abruptly. In addition, the report explains that any wrongdoing the

28 investigations uncover could soil a company's reputation enough to affect a company's standing

1    with customers, employees, and investors. Indeed, on May 22, 2006, Standard & Poor's Rating

2    Services placed its ratings on Juniper on CreditWatch with negative implications, citing the probe

3    related to Juniper's stock option grants.

4    **VII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

5        58.    As detailed herein, during the Class Period, Defendants issued or caused to be issued

6    materially false and misleading statements that deceived the investing public as to Juniper's

7    financial performance and condition.

8        59.    Many of Juniper's false and misleading statements during the Class Period below

9    were made in Form 10-K's and Form 10-Q's that were certified by Defendant Kriens and Defendant

10   Gani in accordance with the Sarbanes-Oxley Act of 2002. By certifying those public filings,

11   Defendants Kriens and Gani represented, *inter alia*, that the quality and accuracy of the information

12   contained therein concerning Juniper's financial performance and condition was safeguarded by

13   internal financial controls in place at Juniper, which were designed to foster the development of

14   reliable financial statements.

15       **A.    Form 10-Q for the Quarterly Period Ending September 30, 2003**

16       60.    On or about November 14, 2003, Juniper filed with the SEC a Form 10-Q for the

17   quarterly period ending September 30, 2003. Defendant Gani signed this Form 10-Q. Pursuant to

18   the Sarbanes-Oxley Act of 2002, this Form 10-Q also included certifications signed by Defendants

19   Kriens and Gani. In that public filing, Juniper reported net income of $7.205 million for the three

20   month period ending September 20, 2003 (as compared to a net loss of $88.33 million for the three

21   months ending September 30, 2002). Juniper further reported net income of $24.466 million for the

22   nine month period ending September 30, 2003 (as compared to a net loss of $128.102 million for

23   the nine month period ending September 30, 2002). Juniper further stated it had recorded tax

24   provisions of $7.7 million and $14.3 million for the three and nine months ended September 30,

25   2003, or effective tax rates of 52% and 37%, respectively.

26       61.    In addition, Juniper noted that its stock option plans were accounted for under the

27   intrinsic value recognition and measurement principles of APB No. 25 (and related interpretations).

28   Juniper indicated that since the exercise price of all options granted under these plans was equal to

[CORRECTED] CLASS ACTION COMPLAINT

1   the market price of the underlying common stock on the grant date, no stock-based employee

2   compensation cost, other than acquisition-related compensation, was recognized in net income.

3       62.    With respect to the issue of internal controls, Juniper indicated it had "carried out an

4   evaluation, under the supervision and with the participation of our management, including the Chief

5   Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of

6   our disclosure controls and procedures as of the end of the period covered by this report." Juniper

7   added that "[b]ased upon that evaluation, the Chief Executive Officer and Chief Financial officer

8   concluded that our disclosure controls and procedures are effective in timely alerting them to

9   material information relating to Juniper (including its consolidated subsidiaries) required to be

10  included in our Exchange Act filings."

11      **B.    Form 10-K for Fiscal Year 2003**

12      63.    On or about February 20, 2004, Juniper filed with the SEC a Form 10-K for Fiscal

13  Year 2003 (ending December 31, 2003). Defendants Kriens, Gani, Sindhu, Hearst, Sclavos, and

14  Stensrud signed Juniper's Form 10-K for Fiscal Year 2003. Pursuant to the Sarbanes-Oxley Act of

15  2002, this Form 10-K also included certifications signed by Defendants Kriens and Gani. In that

16  public filing, Juniper stated that its net income for 2003 was $39.199 million, compared to a net loss

17  in 2002 of $119.56 million (Juniper added it had a net loss of $13.41 million in 2001; net income of

18  $147.91 million in 2000; and a net loss of $9.034 million in 1999). Juniper further indicated that

19  provision for income taxes increased to $19.8 million in 2003 from $4.5 million in 2002.

20  According to Juniper, the 2003 effective rate was 33.6%. Juniper added that provision for income

21  taxes had decreased to $4.5 million in 2002 from $30.0 million in 2001, and that effective tax rates

22  for 2002 and 2001 were − 3.9% and 181%, respectively.

23      64.    Juniper again noted that its stock option plans were accounted for under the intrinsic

24  value recognition and measurement principles of APB No. 25 and related interpretations.

25  According to Juniper, since the exercise price of all options granted under these plans was equal to

26  the market price of the underlying common stock on the grant date, no stock-based employee

27  compensation cost, other than acquisition-related compensation cost, was recognized in net income.

28

65.     Juniper also added that under Juniper's Amended and Restated 1996 Stock Option Plan (the "1996 Plan"), incentive stock options were granted at an exercise price of not less than the fair value per share of the common stock on the date of grant; and that while nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; no nonstatutory stock options had been granted for less than fair market value on the date of grant.

66.     Juniper further noted that in July 2000, its Board of Directors had adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). Juniper indicated that the 2000 Plan provided for the granting of nonstatutory stock options to employees, directors and consultants; and that while nonstatutory stock options could be granted at an exercise price of not less than 85% of the fair value per share on the date of grant, no nonstatutory stock options had been granted for less than fair market value on the date of grant.

67.     With respect to the issue of internal controls, Juniper stated that: "[w]e carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered this report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to Juniper (including its consolidated subsidiaries) required to be included in our Exchange Act filings."

**C.     Form 10-K for Fiscal Year 2004**

68.     On or about March 4, 2005, Juniper filed with the SEC a Form 10-K for Fiscal Year 2003 (ending December 31, 2003). Defendants Kriens, Sindhu, Sclavos, and Stensrud signed Juniper's Form 10-K for Fiscal Year 2004. Pursuant to the Sarbanes-Oxley Act of 2002, this Form 10-K also included certifications signed by Defendant Kriens. In that public filing, Juniper reported 2004 net income of $135.746 million; compared to $39,199 million in 2003 (Juniper further indicated it had a net loss in 2002 of $119.65 million; a net loss in 2001 of $13.41 million; and net

[CORRECTED] CLASS ACTION COMPLAINT

1   income of $147.91 million in 2000). Juniper added that provision for income taxes increased to

2   $83.3 million in 2004 from $19.8 million in 2003.

3        69.    Juniper again reported that its stock option plans were accounted for under the

4   intrinsic value recognition and measurement principles of APB No. 25 and related interpretations.

5   In this regard, Juniper indicated that since the exercise price of all options granted under these plans

6   was equal to the market price of the underlying common stock on the grant date, no stock-based

7   employee compensation cost, other than acquisition-related compensation cost, was recognized in

8   net income. With regard to its stock option plans, Juniper again noted that under the 1996 Plan,

9   incentive stock options were granted at an exercise price of not less than fair value per share of the

10   common stock on the date of grant; and that while nonstatutory stock options could be granted an

11   exercise price of not less than 85% of the fair value on the date of grant. With respect to the 1996

12   Plan, Juniper again stated that while nonstatutory stock options may be granted at an exercise price

13   of not less than 85% of the fair value per share on the date of the grant, no nonstatutory stock

14   options had been granted for less than fair market value on the date of grant.

15        70.    With respect to the issue of internal controls, Juniper stated it had assessed the

16   effectiveness of Juniper's internal control over financial reporting as of December 31, 2004 and it

17   had concluded that "as of December 31, 2004, Juniper Networks Inc.'s internal control over

18   financial reporting is effective."

19       **D.**    **Form 10-K for Fiscal Year 2005**

20        71.    On or about March 7, 2006, Juniper filed with the SEC a Form 10-K for Fiscal Year

21   2003 (ending December 31, 2003). Defendants Kriens, Sindhu, Hearst, Sclavos, and Stensrud

22   signed Juniper's Form 10-K for Fiscal Year 2004. Pursuant to the Sarbanes-Oxley Act of 2002, this

23   Form 10-K also included certifications signed by Defendant Kriens. In that public filing, Juniper

24   stated, among other matters, that its 2005 net income was $354 million; compared to 2004 net

25   income of $135.7 million; and 2003 net income of $3.92 (Juniper further indicated it had a net loss

26   in 2002 of $119.7 million; and a net loss in 2001 of $13.4 million). Juniper added that provision for

27   income taxes increased to $83.3 million in 2004 from $19.8 million in 2003. Juniper further noted

28

[CORRECTED] CLASS ACTION COMPLAINT

1  that provision for income taxes increased to $148.2 million in 2005 from $83.3 million in 2004 (and

2  that provision for income taxes increased to $83.3 million in 2004 from $19.8 million in 2003).

3        72.    Juniper added that Juniper's stock option plans were accounted for under the

4  intrinsic value recognition and measurement principles of APB No. 25 and related interpretations.

5  Juniper added that since the exercise price of all options granted under these plans was equal to the

6  market price of the underlying common stock on the grant date, no stock-based employee

7  compensation cost, other than acquisition-related compensation cost, was recognized in net income.

8  In addition, Juniper again noted that under the 1996 Plan, incentive stock options were granted at an

9  exercise price of not less than the fair value per share of the common stock options were granted at

10  an exercise price of not less than the fair value per share of the common stock on the date of grant;

11  and that while nonstatutory stock options may be granted at an exercise price of not less than 85%

12  of the fair value market value on the date of grant.  Finally, Juniper stated that under the 2000 Plan,

13  non-statutory stock options may be granted at an exercise price of not less than 85% of the fair

14  value per share on the date of grant; but that no non-statutory stock options had been granted for

15  less than fair market value on the date of grant.

16        73.    With respect to the issue of internal controls, Juniper stated it had assessed the

17  effectiveness of Juniper's internal control over financial reporting as of December 31, 2005 and it

18  had concluded that "as of December 31, 2005, Juniper Network's Inc.'s internal control over

19  financial reporting is effective."

20        74.    Defendants' statements concerning Juniper's financial performance and condition as

21  set forth above were each false and misleading when made because they misrepresented or omitted

22  the following material adverse facts that the Defendants knew at the time the statements were made:

23        a.    That stock options to Juniper employees were not always issued at the fair

24  market value of Juniper's stock on the date of the grant since the Defendants repeatedly

25  manipulated option grant dates to coincide with particularly low share prices (so as to benefit option

26  recipients);

27        b.    That Juniper had not consistently followed the dictates in APB No. 25 in that

28  (i) options priced at below a stock's fair market value when they are awarded results in an executive

[CORRECTED] CLASS ACTION COMPLAINT

1   receiving an instant paper gain; and (ii) Juniper did not treat that "paper gain" as a cost to the

2   corporation in its financial statements (thus inflating Juniper's net earnings);

3           c.      That Juniper understated its income tax liability since options backdated to a

4   day with a lower market price do not qualify for a Section 162(m) deduction (since such grants are

5   not deemed performance-based compensation);

6           d.      That Company insiders (including defendants Kriens, Sindhu and Gani)

7   received backdated options and thus took excess and unjustified compensation at the expense of the

8   investing public;

9           e.      That significant accounting errors existed in Juniper's historic financial

10  statements;

11          f.      That Juniper had failing and deficient internal controls and procedures and

12  lacked any meaningful ability to accurately report its financial results; and

13          g.      That Juniper's illicit scheme vis-à-vis backdating stock option grant dates

14  potentially subjected Juniper to substantial regulatory fines, penalties and other legal action, thereby

15  compromising Juniper's overall financial condition and prospects.

16  **VIII.   THE TRUTH IS FINALLY REVEALED**

17          75.     As noted above, a May 2006 study of 100 companies by the CFRA said that Juniper

18  was among 17 companies in that group which showed a "high-risk profile" for possible back-dating

19  of options.  In addition, at or about that same time, a J.P. Morgan analyst who had reviewed option

20  grants to executives at seventeen companies dating back to 1998 concluded, with respect to Juniper,

21  that there existed a suspicious pattern of grants at the stock's low price for a given month.  The

22  announcement of these findings had an immediate impact on Juniper's stock price.  Juniper's stock,

23  which had closed the month of April 2006 at $18.48 per share stood at only $16.10 per share by the

24  close of trading on May 18, 2006.

25          76.     Prior to the opening of trading on May 22, 2006, Juniper issued a press release in

26  which it announced that Juniper had received a request for information from the office of the United

27  States Attorney for the Eastern District of New York relating to Juniper's granting of stock options.

28  Juniper indicated that (i) it was actively engaged in responding to this request for information; and

[CORRECTED] CLASS ACTION COMPLAINT

1  (ii) its Audit Committee was reviewing Juniper's historical stock option granting practices.  On the

2  release of this news, Juniper shares dropped to a 52-week low of $14.62 during morning trading on

3  May 22, 2006.

4  **IX.    IMAPPLICABILITY OF SAFE HARBOR**

5  77.    As alleged herein, the Defendants acted with scienter in that they knew, at the time

6  that they issued them, that the public documents and statements issued or disseminated in the name

7  of Juniper were materially false and misleading or omitted material facts; knew that such statements

8  or documents would be issued or disseminated to the investing public; knew that persons were

9  likely to reasonably rely on those misrepresentations and omissions; and knowingly and

10  substantially participated or were involved in the issuance or dissemination of such statements or

11  documents as primary violations of the federal securities law.  As set forth elsewhere herein, the

12  Defendants, by virtue of their (i) receipt of information reflecting the true facts regarding Juniper,

13  (ii) control over, and/or receipt of Juniper's allegedly materially misleading misstatements, and (iii)

14  access to confidential proprietary information concerning Juniper were informed of, participated in

15  and knew of the fraudulent scheme alleged herein.  With respect to non-forward looking statements

16  and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature

17  of the information which they caused to be disseminated to the investing public.

18  79.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any

19  forward-looking statement pled herein, the Defendants are liable for the false forward-looking

20  statement pled because, at the time each forward-looking statement was made, the speaker knew or

21  had actual knowledge that the forward-looking statement was materially false or misleading, and

22  the forward-looking statement was authorized and/or approved by a director and/or executive

23  officer of Juniper who knew that the forward-looking statement was false or misleading.  None of

24  the historic or present tense statements made by the Defendants was an assumption underlying or

25  relating to any plan, projection or statement of future economic performance, as they were not

26  stated to be such an assumption underlying or relating to any projection or statement of future

27  economic performance when made nor were any of the projections or forecasts made by the

28

Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.   ADDITIONAL SCIENTER ALLEGATIONS

80.    As alleged herein, the Defendants acted with scienter in that, *inter alia*, the Defendants knew or acted with recklessness with respect to the fact that the public documents and statements issued or disseminated in the name of Juniper were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities law. As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Juniper, their control over and/or receipt of modification of the allegedly materially misleading misstatements and omission described herein, which made them privy to confidential proprietary information concerning Juniper, directly and substantially participated in the fraudulent scheme alleged herein.

81.    Moreover, the ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge of individuals at the highest levels of Juniper, including the Individual Defendants.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

82.    The Market for Juniper's securities was open, well-developed and efficient at all relevant times for the following reasons (among others):

a.    Juniper's shares met the requirements for listing, and were listed and actively traded on NASDAQ;

b.    As a regulated issuer, Juniper filed periodic public reports with the SEC;

c.    Juniper regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    The market reacted to public information disseminated by Juniper;

[CORRECTED] CLASS ACTION COMPLAINT

1        e.     Juniper was followed by numerous material securities analysts employed by

2 major brokerage firms who wrote reports which were distributed to the sales force and certain

3 customers of their respective brokerage firms. Each of these reports was publicly available and

4 entered the public marketplace;

5        f.     The material misrepresentations and omissions alleged herein would tend to

6 induce a reasonable investor to misjudge the value of Juniper securities; and

7        g.     Without knowledge of the misrepresented or omitted material facts, Plaintiff

8 and the other members of the Class purchased or otherwise acquired Juniper securities between the

9 time Defendants made the material misrepresentations and omissions and the time the fraudulent

10 backdating was being disclosed, during which time the price of Juniper securities was inflated by

11 Defendants' misrepresentations and omissions.

12     83.     Because of the foregoing, the market for Juniper's securities promptly digested

13 current information regarding Juniper from all publicly available sources and reflected such

14 information in Juniper's securities prices. Under these circumstances, all purchased and acquires of

15 Juniper's securities prices. Under these circumstances, all purchasers and acquires of Juniper's

16 securities during the Class Period suffered similar injury through their purchase or acquisition of

17 Juniper's securities at artificially inflated prices and a presumption of reliance apply.

18 **XII.   LOSS CAUSATION**

19     84.     Throughout the Class Period, the prices of Juniper's securities were artificially

20 inflated as a direct result of Defendants' fraudulent misrepresentations regarding Juniper's financial

21 condition and results.

22     85.     Juniper's financial condition and results, including Juniper's fraudulent practices vis-

23 à-vis backdated stock option grants, were material information to Plaintiff and the other members of

24 the Class. Had the truth been disclosed to the market at or before the end of the Class Period,

25 Plaintiff and the other Class members would not have purchased Juniper stock at all, or would have

26 done so only at substantially lower prices than the artificially inflated prices which they actually

27 paid.

28

86.    When the truth about Juniper was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was swiftly eliminated from the price of Juniper's securities, causing significant losses to Plaintiff and the other Class members. The disclosures of third-party reports into the suspicious stock option grant practices of Juniper, as well as the May 22, 2006 disclosure of the U.S. Attorneys' investigation of Juniper's stock option grant process, led to a flurry of trading in which Juniper's stock price plunged from its $18.48 close on April 28, 2006, to an opening price of $14.62 on May 22, 2006 (this represented a loss of market capitalization of over $1.34 billion).

87.    The decline in Juniper's securities price following the revelations of Juniper's fraudulent practices, and the resulting losses suffered by Plaintiff and the other members of Class, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of Juniper's securities price to reflect the newly emerging truth about Juniper's financial condition.

88.    Defendants' fraudulent conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## XIII.  CAUSES OF ACTION

### COUNT I

#### Violation of Section 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder

#### (Against all Defendants)

89.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.    This court is asserted by Plaintiff on behalf of itself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15, U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

91.    During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Juniper's securities; and (iii) cause Plaintiff and other members of the

86.     When the truth about Juniper was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was swiftly eliminated from the price of Juniper's securities, causing significant losses to Plaintiff and the other Class members. The disclosures of third-party reports into the suspicious stock option grant practices of Juniper, as well as the May 22, 2006 disclosure of the U.S. Attorneys' investigation of Juniper's stock option grant process, led to a flurry of trading in which Juniper's stock price plunged from its $18.48 close on April 28, 2006, to an opening price of $14.62 on May 22, 2006 (this represented a loss of market capitalization of over $1.34 billion).

87.     The decline in Juniper's securities price following the revelations of Juniper's fraudulent practices, and the resulting losses suffered by Plaintiff and the other members of Class, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of Juniper's securities price to reflect the newly emerging truth about Juniper's financial condition.

88.     Defendants' fraudulent conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## XIII.  CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder

### (Against all Defendants)

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     This court is asserted by Plaintiff on behalf of itself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15, U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

91.     During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Juniper's securities; and (iii) cause Plaintiff and other members of the

[CORRECTED] CLASS ACTION COMPLAINT

Class to purchase or otherwise acquire Juniper's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

92.    The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements or material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquires of Juniper's securities in an effort to maintain artificially high market prices for Juniper's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

93.    Because of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to Juniper's operations and performances so that the market prices of Juniper's publicly traded securities would be based in truthful, complete and accurate information. The Defendants' material misrepresentations and omissions as set forth herein violated that duty.

94.    The Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. The Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

95.    Because of the Defendants' fraudulent activity, the market price of Juniper was artificially inflated during the Class Period.

96.    In ignorance of the true financial condition of Juniper, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Juniper containing the misleading information, purchased or otherwise acquired Juniper securities at artificially inflated prices during the Class Period.

1  Class to purchase or otherwise acquire Juniper's securities at artificially inflated prices. In

2  furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them,

3  took the actions set forth herein.

4       92.    The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made

5  untrue statements or material fact and/or omitted to state material facts necessary to make the

6  statements not misleading by use of means or instrumentalities of interstate commerce; and (iii)

7  engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the

8  purchasers and acquires of Juniper's securities in an effort to maintain artificially high market prices

9  for Juniper's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

10       93.    Because of their making and/or their substantial participation in the creation of

11  affirmative statements and reports to the investing public, the Defendants had a duty to promptly

12  disseminate truthful information that would be material to investors in compliance with the

13  integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R.

14  §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with

15  respect to Juniper's operations and performances so that the market prices of Juniper's publicly

16  traded securities would be based in truthful, complete and accurate information. The Defendants'

17  material misrepresentations and omissions as set forth herein violated that duty.

18       94.    The Defendants engaged in the fraudulent activity described above knowingly and

19  intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and

20  the Class. The Defendants knowingly caused their reports and statements to contain misstatements

21  and omissions of material fact as alleged herein.

22       95.    Because of the Defendants' fraudulent activity, the market price of Juniper was

23  artificially inflated during the Class Period.

24       96.    In ignorance of the true financial condition of Juniper, Plaintiff and other members

25  of the Class, relying on the integrity of the market and/or on the statements and reports of Juniper

26  containing the misleading information, purchased or otherwise acquired Juniper securities at

27  artificially inflated prices during the Class Period.

28

[CORRECTED] CLASS ACTION COMPLAINT

97. The market price of Juniper's securities decline materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

98. Plaintiff's (and the Class') losses were proximately caused by Defendants' active and primary participation in Juniper's scheme to defraud the investing public by, among other things, falsifying Juniper's financial results through the knowing or reckless failure to properly apply GAAP. Plaintiff (and the members of the Class) purchased Juniper securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Juniper securities through their misconduct as described herein. Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses were a direct and foreseeable consequence of Defendants' failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Juniper.

99. Throughout the Class Period, Defendants were aware of material non-public information concerning Juniper's fraudulent conduct (including the false and misleading accounting statements). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding Juniper's falsified revenue figures, and Plaintiff's (and the Class') losses were the foreseeable consequence of Defendants' concealment of this information.

100. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Juniper securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### (Against all Defendants)

101. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102. As alleged herein, the Individual Defendants acted as controlling persons of Juniper within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of

[CORRECTED] CLASS ACTION COMPLAINT

1   Juniper, including the content and dissemination of the various statements which Plaintiff contends

2   are false and misleading. The Individual Defendants were provided with or had unlimited access to

3   copies of Juniper's internal reports, press releases, public filings and other statements alleged by

4   Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the

5   ability to prevent the issuance of the statements or cause the statements to be corrected.

6       103.    In particular, the Individual Defendants had direct involvement in the day-to-day

7   operations of Juniper and therefore, are presumed to have had the power to control or influence the

8   particular transactions giving rise to the securities violations as alleged herein, and exercised the

9   same.

10      104.    As set forth above, the Individual Defendants and Juniper committed a primary

11  violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in

12  this Complaint. By virtue of their positions as controlling persons of Juniper, the Individual

13  Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

14  result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class

15  suffered damages in connection with their purchase or acquisition of Juniper securities during the

16  Class Period.

17  **XIV.   <u>PRAYER FOR RELIEF</u>**

18      WHEREFORE, Plaintiff prays for relief and judgment, as follows:

19      A.    Determining that this action is a proper class action;

20      B.    Awarding compensatory damages in favor of Plaintiff and the other class members

21  against all Defendants, jointly and severally, for all damages sustained because of the Defendants'

22  wrongdoing , in an amount to be proven at trial, including interest thereon;

23      C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

24  action, including counsel fees and expert fees; and

25      D.    Awarding such other and further relief as the court may deem just and proper.

26

27

28

[CORRECTED] CLASS ACTION COMPLAINT

1

2    **XV.    JURY TRIAL DEMANDED**

3    Plaintiff hereby demands a trial by jury on all claims set forth herein.

4

5    Dated: June 7/25, 2007

6    By: _Reginald_

7    DONALD AMAMGBO, ESQ.
     AMAMGBO & ASSOCIATES

8    7901 Oakport Street, Suite 4900
     Oakland, California 94621

9    Telephone:  (510) 615-6000
     Facsimile:  (510) 615-6025

10

11   REGINALD TERRELL, ESQ.
     THE TERRELL LAW GROUP

12   223 25th Street
     Richmond, California 94804

13   Telephone:  (510) 237-9700
     Facsimile:  (510) 237-4616

14

15   LAW OFFICES OF NWAJEI &
     COMPANY

16   Lawrence D. Nwajei
     4221 Wilshire Blvd., Suite 392
     Los Angeles, CA 90010

17   Telephone:  323-549-0201
     Facsimile:  323-549-0211

18

19

20

21

22

23

24

25

26

27

28

[CORRECTED] CLASS ACTION COMPLAINT